WILLIAM W. PARKER vs. WILLIAM H. TRUESDALE.

Argued June 29, 1893. Affirmed July 21, 1893.

**The Court had Power to Establish a Street Grade under a Certain Statute.**

> In enforcing against a railway company the duty imposed by its charter, to construct, when necessary, on a street or highway crossing its tracks, a bridge or viaduct, with the approaches, the court has power to establish the grade therefor, though that involves a change in the grade previously established for the street or highway. MITCHELL, J., dissenting. State v. Minneapolis & St. L. Ry. Co., 39 Minn. 219, and Robinson v. The Great Northern Ry. Co., 48 Minn. 445, followed.

Appeal by plaintiff, William W. Parker, from an order of the District Court of Hennepin County, William Lochren, J., made March 6, 1893, refusing him a new trial.

The Minneapolis & St. Louis Railway was in the hands of the defendant, William H. Truesdale, Receiver, appointed June 28, 1888, by the District Court of Hennepin County. By its charter, Sp. Laws 1853, ch. 66, and subsequent amendments, that company was authorized to construct its railroad across streets, subject however to the duty to put the street in such condition or repair as not to interfere with its free and proper use. Its railroad was constructed and operated across Fifth Street North in Minneapolis. On November 11, 1886, that city commenced proceedings by mandamus against the Railway Company, and obtained judgment March 6, 1888, compelling it, in fulfillment of its charter duty, to construct in that street a bridge over its tracks, with suitable approaches, and at the same time afford access to the railway tracks, warehouses and offices thereon, in conformity with certain plans referred to and made part of such judgment. This judgment was affirmed in this Court. State ex rel. v. Minneapolis & St. L. Ry. Co., 39 Minn. 219. Meantime defendant was appointed Receiver and took possession of the railway, and in November, 1890, constructed the bridge and approaches. The railway tracks were lowered and the east half of the street graded down to a descending slope, of four feet to the hundred, to the railway sidetracks, while the west side of the street was filled to an ascending

v.54M.—16

grade of four feet to the hundred onto the bridge crossing over the railway. A retaining wall was built along the center of the street between the two grades.

Plaintiff owned a warehouse and lot fronting onto the half of the street so lowered. He claimed that the grade of the street was established by the city some years before, and that he built his warehouse in conformity thereto. That the city had not since altered the grade, and that defendant by sinking the east half of the street in front of his warehouse and building the wall, had depreciated the value of his property $10,000, and he obtained leave and brought this action, to recover of defendant that sum therefor. The defendant answered that he had not done this work voluntarily, but in pursuance of the command of the courts, and that they had jurisdiction and authority in the *mandamus* case, to change the grade of the street without citing the abutting owner, or bringing him in as a party. The issues were tried before Hon. *Thomas Canty,* then one of the Judges of the District Court. After the evidence was all in, the Judge directed a verdict for the defendant. A case was made and settled, and in the absence of Judge *Canty* from the State, a motion for a new trial was made before Judge *William Lochren,* who presided on the hearing in the *mandamus* proceedings. The new trial was refused, and plaintiff appeals.

*Gilger & Harrison,* for appellant.

The *mandamus* did not exonerate the defendant from the expense of performing the duty which was imposed upon the railroad company by the terms of its charter, viz.: That of obtaining by condemnation proceedings or otherwise, sufficient land to perform its duty of putting the streets which it crosses into their former state, or in a condition not impairing their usefulness. The plaintiff was not a party to the *mandamus* proceedings and is not bound thereby. The grade of the street had been once established, and plaintiff had erected his warehouse with reference to such grade. This cut was for the purpose of making a way down to the freight depot of the Railroad Company. It was incumbent upon the Company to acquire the right to so lower the street the same as any other land which it wished to use for railway purposes. *Gray* v.

*First Div. St. P. & P. R. Co.*, 13 Minn. 315, (Gil. 289;) *Lamm* v. *Chicago, St. P., M. & O. Ry. Co.*, 45 Minn. 71; *Kaiser* v. *St. Paul, S. & T. F. R. Co.*, 22 Minn. 149.

The city has done no act whereby it has assumed the responsibility of this work, and the defendant has done it, and admits the acts and the damage; but says it is not liable, because the court ordered it to perform its duty under its charter. This court, in referring to the duty of the railroad company to restore the cross streets, has said the duty of this Company to restore the crossing, is an absolute one. It will be for that company to secure such additional land or rights, or make such changes as may be necessary to effect the result, or abandon the crossing. *State ex rel.* v. *St. Paul, M. & M. Ry. Co.*, 38 Minn. 246; *State ex rel.* v. *St. Paul, M. & M. Ry. Co.*, 35 Minn. 131.

*Albert E. Clarke* and *Wilbur F. Booth*, for respondent.

The City of Minneapolis has full and exclusive control of all streets within its corporate limits and may make them wide or narrow, change the grades, or vacate them wholly or partially. The city being in full and exclusive control of its streets, demanded that defendant's railway, in the performance of its duty to the public, make use of a certain portion of this street in the construction of an approach to its freight depot, so that the public, in whose interest all highways are presumed to be constructed, might have free and convenient access thereto. The descending approach referred to, is constructed wholly upon and within the public highways of the city. The use, to which the approach when constructed was to be devoted, was that of a public highway leading to a public place—a railroad freight depot and yard. The requirement of the city was, that the defendant, having lowered the grade of the railroad tracks, should at its cost so change the grade of the streets which formerly afforded access to such tracks, that the same streets should afford access to the track when lowered. That the city itself had the right to change the grade of the streets in question without liability to abutting owners is conceded. That it required from defendant nothing more than such change of grade, must also be conceded. The Railroad Company was not required to acquire land or to condemn land for an approach. It could not

condemn the highway for the purpose. The city tendered the defendant a portion of the public highway, and demanded that such defendant enter upon such highway and so change its grade, that it should afford access to the freight depot and yards; and upon defendant's refusal to do so, the court compelled acquiescence. The work was done and defendant has paid for it, and the question of acquiring other land is not in this case. The defendant was not permitted to acquire other land. It was compelled to use the highway and to do the work in the manner specifically required by the city. The right of the city to do this work, without liability to the plaintiff, was settled in this court in the case of *Yanish* v. *City of St. Paul*, 50 Minn. 518; *Rauenstein* v. *New York, Lackawanna & W. Ry. Co.*, 136 N. Y. 528; *Conklin* v. *New York, O. & W. Ry. Co.*, 102 N. Y. 107; *Ottenot* v. *New York, Lackawanna & W. Ry. Co.*, 119 N. Y. 603; *Robinson* v. *Great Northern Ry. Co.*, 48 Minn. 445.

Counsel for the appellant also urge the proposition that because the City of Minneapolis failed to pass an ordinance requiring the change of grade to be made by the defendant, the action of the city in instituting and prosecuting the *mandamus* action to judgment was unauthorized and invalid. This question does not require extended argument. The District Court held that the city was authorized to maintain the action. This court affirmed the decision. The defendant has been compelled to perform the decree, at an expense of about a quarter of a million of dollars. The claim that the defendant has committed an unauthorized trespass in the performance of a duty, imposed by its charter and enforced by the highest court in the State, cannot be seriously urged. The assent of the city to the change of grade has been signified most unequivocally.

GILFILLAN, C. J. It is obvious that if the cut on the northerly part of Third avenue north, in front of plaintiff's premises, was in accordance with the lawfully-established grade, whether the work of cutting down to such grade was done by the city, or by some other person by its authority, or upon its requirement, no liability accrued to plaintiff by reason thereof; and under the charter of the city of Minneapolis it makes no difference with this proposition that the grade on which the cut was made was a change from one pre-

viously established. *Henderson* v. *City of Minneapolis*, 32 Minn. 319, (20 N. W. Rep. 322.) So the only questions in the case are, was the cut made upon a legally-established grade? and was it made by authority of the city? That the grade for the cut was lower than the grade as first established, and covered or included only a part of the width of the street, leaving the other part on, or perhaps raised above, the grade, as first established, does not make it illegal, for the authority which may establish the grade for a street may, under peculiar circumstances, adopt one plane for a part of the width of the street, and a higher or lower plane for the other part, requiring a retaining wall to sustain the part on the higher plane. *Yanish* v. *City of St. Paul*, 50 Minn. 518, (52 N. W. Rep. 925.) The charter of the city of Minneapolis (Sp. Laws 1881, ch. 76, subch. 8, § 2) authorizes the common council to establish grades, and, by a vote of two-thirds, to change the grade of any street after such grade has been established. So far as appears in this case, the council never, by ordinance or resolution passed by a two-thirds vote, made any change in the grade of Third avenue north, as it had been previously established; and if the sole power to change an established grade rests in the common council, the cut, which was below the grade as established, and not changed by the council, was, as between the abutting property owners and the person making it, unauthorized and wrongful. And this brings us to the question whether, in such proceedings as were proved in this case, which proceedings have been several times, directly or indirectly, before this court, the court has the power, equally with the council acting under the charter, to change established grades, when deemed necesary. If it has, then this action in changing grades has the same effect, and precisely the same consequences, as the action of the council making a change under the provisions of the charter. It is no answer to this that the abutting property owner is not in person a party to the proceeding, nor a party in any other sense than that the entire public interested in the use of the streets and the establishment of grades is represented by the city which prosecutes the proceeding. In no other sense would he be a party to a proceeding to change grades, before the council; and certainly no one could say that a change made by the council was invalid because he was not personally brought before it.

The proceeding was in behalf of the public, represented by the municipality, to enforce the performance by the railway company of the duty imposed on it by its charter, to restore any street or highway crossed by its tracks "to its former state, or in a sufficient manner not to impair its usefulness to the owner or to the public," which duty, as construed by this court in *State* v. *St. Paul, M. & M. Ry. Co.*, 35 Minn. 131, (28 N. W. Rep. 3,) and *State* v. *Minneapolis & St. L. Ry. Co.*, 39 Minn. 219, (39 N. W. Rep. 153,) includes the construction, when necessary to the free public use of the highway, of bridges or viaducts, and the approaches thereto.  Of course the legislature intended that, when not voluntarily performed, the courts should enforce that duty, and should have all the powers necessary to accomplish that end.  And as said in the last-cited case, and as must be obvious, when the parties—the public authorities in charge of the streets and highways, on one side, and the railway company, on the other—do not agree as to what shall be done, it must, of necessity, be for the courts, when appealed to, to determine what the public interests require to be done, within the duty imposed on the railway company, and how it shall be done, including the grade or level upon which any bridge or viaduct, and the approaches thereto, shall be constructed; and for this purpose the court must have as full and complete authority over the streets and highways as the necessity of the case requires, and as the legislature could vest in any one.  That the court may impose the duty on the company to carry the street across the tracks at a level higher or lower than the previously established grade, and yet it be unlawful, as to any one, for the company to construct the crossing on that level, involves an absurdity.  The construction of a bridge or a viaduct across the tracks on a particular street, changing the grade of the street, may make necessary the readjustment of the grades of other streets in the vicinity, so as to preserve to the public the beneficial use of such streets in connection with that on which the crossing is constructed.  Before applying for the *mandamus* to compel the railway company to perform the duty to the public imposed on it by its charter, the city caused to be prepared by its engineer careful and comprehensive plans of the work it deemed necessary to be done, including that on several streets; among them, a part of Third avenue north.  These plans, which

were attached to the alternative writ, are referred to in the judgment, and the work directed-to be done in accordance therewith. On these plans appears the cut in question, which appears as intended to preserve to the public a practicable way to and from the freight houses of the company. , The judgment necessarily changed the previously established grade of that part of the avenue to the grade necessary to make the cut represented on the plan. It is not disputed that the work was done according to the plans and judgment. The case is fully covered by *Robinson* v. *The Great Northern Railway Co.*, 48 Minn. 445, (51 N. W. Rep. 384.) If, in any case where a change of grade of a street is made by the proper authority, it can be alleged to be invalid because made for the purpose of benefiting a private person, it can be only where it is unmistakable that a determination of what the public interest requires was not the reason for the change. The fact that one person may be incidentally benefited by the change certainly is not enough. The cut in question is as much a public highway as the avenue ever was. No one, except as one of the public, has any interest in it. And if the court determined—as we are bound to presume it did, and as we would have been bound to presume of the council, had it changed the grade—that the public interest required the cut-to be made to preserve a way of access for the public to the company's freight houses, the fact that it also facilitates the transaction by the company of its business with the public can be no legal objection to the change of grade.

Order affirmed.

MITCHELL, J., dissents.

(Opinion published 55 N. W. Rep. 901.)